IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Case No. BK25-40156 |
| CLEO G. SPENCER and AUTUMN M. SPENCER, | ) ) ) | Chapter 7 |
| Debtors. | ) ) | |
| _____ | ) ) | _____ |
| NEBRASKALAND BANK, | ) ) | Adv. Pro. A25-4006 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CLEO G. SPENCER, | ) ) | |
| Defendant. | ) ) | |

**Order Partially Excepting Debt From Discharge**

The plaintiff NebraskaLand Bank objects under 11 U.S.C. § 523(a)(2)(B) to the dischargeability of debt owed by the debtor and defendant Cleo G. Spencer. Trev E. Petersen appeared for the bank. John Lentz appeared for and with the debtor. The debtor stipulated to most elements of the bank's claim except reasonable reliance and intent to deceive. The bank reasonably relied on the written financial statements, one of which the debtor signed with reckless indifference to or reckless disregard of its accuracy. Therefore $191,000 of the total indebtedness is excepted from discharge.

**Findings of Fact**

The debtor owned and operated Red Willow Aviation & Spraying, Inc. Red Willow was the fixed base operator of the McCook Airport, providing essential aeronautical services including airplane repair, flight instruction, and aerial chemical spraying. Before he purchased Red Willow, the debtor was a loan officer for Adams Bank and Trust for four years. The debtor was introduced to Red Willow and Red Willow's previous owner because Adams Bank held Red Willow's loans.

When the debtor started as the loan officer on Red Willow's loan, Red Willow was in financial trouble. The debtor assisted in making it what he called "bankable." As a loan officer, the debtor was very familiar with financial statements and borrowing base certificates. He also took classes in fraud examination, though he never became certified.

Red Willow's then-owner was interested in selling the business. He had neither a succession plan nor interested buyers. In August 2021, Red Willow hired the debtor as Chief Operating Officer. As COO, and later as Red Willow's owner, the debtor monitored financial statements. He also monitored Red Willow's employees to ensure they properly performed their duties.

The debtor planned to purchase Red Willow within five years. After the owner was involved in a serious motor vehicle collision, the transition accelerated. The debtor purchased the business in August 2022. Shortly thereafter the debtor moved Red Willow's banking business to NebraskaLand Bank.

Red Willow had two secured loans with the bank. Both loans originated on August 31, 2022, and were cross-collateralized. The debtor personally guaranteed both. One of the loans is a term loan in the original principal amount of $2.6 million. The stated collateral is real estate, which was liquidated. As of May 13, 2026, the balance due on the real estate loan is $11,718.32, which is entirely interest.

The other loan is an operating line of credit in the original maximum principal amount of $8.5 million. As a line of credit, the amount borrowed varied depending on Red Willow's needs. The line of credit advanced automatically when checks were presented for payment from Red Willow's account. Payments toward the line of credit were automatically swept out of the account when Red Willow's account had sufficient funds. The line of credit has no maturity date and is due on demand. The stated collateral is Red Willow's personal property, including inventory, equipment, accounts, and accrued rebates on chemicals.

The record does not reflect when the bank first funded the line of credit. The loan transaction history offered into evidence begins January 2, 2024. On January 2, Red Willow made a principal payment of $18,000, reducing the principal balance to $7,148,629.73. The parties stipulated as of May 13, 2026, the balance due on the loan is the principal amount of $3,741,263.43, plus interest of $642,038.35, for a total of $4,383,301.78. Interest accrues at the rate of 4.75%.

The bank monitored its personal property collateral position through borrowing base certificates and financial statements, which Red Willow provided the bank periodically. Before submitting the certificates to the bank, the debtor reviewed and signed them. The debtor was familiar with borrowing base certificates as a loan officer for Adams Bank, and as COO and owner of Red Willow. When the bank received a certificate and accompanying financial statements, it reviewed them and used them, in part, to determine whether to continue to advance funds to Red Willow on the line of credit. When the bank had questions about the financial information, which at times it did, the bank followed up with Red Willow and the debtor. The bank's loan committee also reviewed the loan periodically along with Red Willow's financial documents.

Significant assets on the certificates included inventory on hand, inventory in transit, and chemical rebates. Inventory in transit included inventory purchased and paid for but not yet received, and inventory received, paid for, but returned and not yet credited. Chemical rebates were incentive payments from chemical manufacturers and distributors. Inventory in transit accounted for, on average, 27% of Red Willow's reported assets each month. Accrued but unpaid rebates accounted for 26%.

The bank audited Red Willow's physical inventory-on-hand semi-annually. The bank did not audit accrued chemical rebates because the companies, rebate programs, and chemical purchases changed year to year, making an audit difficult. The bank also did not audit inventory in transit.

The parties stipulated:

> Spencer provided borrowing base certificates, balance sheets and income statements to NebraskaLand from time to time between August 31, 2022 and the date of the filing of the [Red Willow] bankruptcy case.

> The borrowing base certificates, income statements and balance sheets purported to represent the financial condition of [Red Willow] at the time issued.

> The borrowing base certificates, income statements and balance sheets contained errors of material facts concerning [Red Willow] rendering the borrowing base certificates, income statements and balance sheets materially false.

The exact reason for the falsity is not clear. It appears to be overstated chemical rebates and inventory in transit.

The debtor contends he did not intend to deceive the bank. The debtor testified that two Red Willow employees entered rebates and inventory purchases and returns into Red Willow's integrated software platform, AgVance. The AgVance reports were used to create the certificates. Before submitting them to the bank, the debtor reviewed the certificates to "varying degrees." His review included comparing the numbers reported on the certificate to the numbers reported in Red Willow's financial statements. Based on his reviews, he testified he had no reason to doubt the accuracy of the information Red Willow provided the bank.

In December 2023, the debtor hired a business broker to sell Red Willow. The business had been very profitable in 2022, but drought conditions hurt its revenue in 2023. And the debtor did not enjoy operating the business. Before listing the business, the debtor obtained a valuation from the SBA. The SBA valued the business at $26 million to $28 million. The listing generated three interested buyers, one of whom was "very interested."

The debtor testified he pulled the listing at the end of October 2024. An interested buyer requested detailed information to support Red Willow's stated asset values. The debtor ran a detailed inventory report and reviewed detailed accounting journal entries on October 29, 2024. He dug into the report the day he ran it. When he dug in, he could not get the rebate numbers to reconcile. He testified the information he reviewed simply did not make sense. The debtor then reviewed the employee's data entries in the AgVance software system. He found one entry that "scared" him. The debtor continued to investigate.

The debtor never fully determined why Red Willow's financial information was not accurate. He speculated that his employees entered rebate information incorrectly. He speculated that the AgVance software might be the problem. He spoke with his CPA. He spoke with AgVance. He decided to file for bankruptcy by November 15 if he could not determine and resolve the issue because the errors were "devastating."

Despite his concerns, the debtor did not inform the bank. He signed a borrowing base certificate for October the day after he found the issue that "scared" him. The debtor testified it was not clear to him what was happening with the financials and he wanted time to decide. But he never told the bank he found a problem in the financials.

After discovering the issue, Red Willow borrowed an additional $24,000 on October 31, 2024, $69,000 on November 5, $36,000 on November 6, and $62,000 on November 8. It also made significant payments around the same

time including $181,000 on October 28, $749,232 on October 30, $199,130 on November 1, $33,000 on November 12, and $14,000 on November 14.

Red Willow filed its bankruptcy case on November 14, 2024. The debtor filed his bankruptcy case on February 25, 2025.

The bank and Red Willow's Chapter 7 trustee attempted to collect unpaid rebates. Using approximate numbers, the final borrowing base certificate reported $2.8 million in accrued but unpaid rebates. The bank was able to collect $105,000. Of $766,000 in reported accounts receivable, the bank recovered $185,000. The bank argued the disparity establishes the borrowing base certificates were false. The bank's loan officer testified at least one manufacturer stated no rebate was due because Red Willow did not purchase any product.[1]

The business broker with whom the debtor listed Red Willow appeared at trial, traveling at his own expense from Colorado. The broker testified as to the debtor's good character and honesty in the sales transaction. He also testified that Red Willow's listing agreement expired in September 2024. The broker's testimony is inconsistent with the debtor's stated reason for reviewing the account inventory report on October 29.

### Conclusions of Law

Bankruptcy provides an honest but unfortunate debtor a fresh start by discharging debt. *See McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 644 (Bankr. D. Minn. 2017). But a debtor's pre-filing conduct may justify excepting a specific debt from the scope of the discharge. The statutory exceptions are stated in 11 U.S.C. § 523. The plaintiff has the burden to prove a claim under § 523 by a preponderance of the evidence. *See Willmar Elec. Servs. v. Dailey (In re Dailey)*, 592 B.R. 341, 349 (D. Neb. 2018).

The bank asserts its loans are excepted from discharge under § 523(a)(2)(B) because the debtor provided a false financial statement. A debtor is not discharged from any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

---

[1] The disparity is evidence of but is not necessarily dispositive of falsity. But resolution of the falsity issue is not necessary because the debtor stipulated the financial information and borrowing base certificates contained materially false information. The debtor did not limit the stipulated falsity, which appears to apply to every submission to the bank.

(B) use of a statement in writing—
- (i)   that is materially false;
- (ii)   respecting the debtor's or an insider's financial condition;
- (iii)   on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
- (iv)   that the debtor caused to be made or published with intent to deceive

11 U.S.C. § 523(a)(2)(B).

The phrase "to the extent obtained by" is important in this case. The United States Supreme Court held the phrase does not modify "any debt"; it modifies "money, property, services, or an extension, renewal, or refinancing of credit." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998). This case involves two loans. Putting aside the cross-collateralization clauses, one loan is a line of credit with multiple advances or extensions of credit and secured by personal property. The other is a term loan secured by real estate. The real estate loan was not obtained by a false financial statement. The false financial statements concerned the personal property collateral. The borrowing base certificates and financial statements were used only to determine collateral coverage for the line of credit.

Several elements of § 523(a)(2)(B) are easily met. The borrowing base certificates and financial statements Red Willow produced are statements in writing. The debtor stipulated the statements were materially false. "A written statement is materially false if it paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information that would normally affect the lender's decision to extend credit." *Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 813 (B.A.P. 8th Cir. 2011). The statement is respecting Red Willow's financial condition because it has a "direct relation to or impact" on Red Willow's "overall financial status." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 720 (2018). Red Willow is an insider of the debtor. *See* 11 U.S.C. § 101(31). The remaining elements are reasonable reliance and intent to deceive.

The bank met the reliance element. "Section 523(a)(2)(B) expressly requires not only reasonable reliance but also reliance itself." *Field v. Mans*, 516 U.S. 59, 68 (1995). To establish reasonable reliance, the court looks to the totality of the circumstances. *See First Nat'l Bank v. Pontow*, 111 F.3d 604, 610 (8th Cir. 1997). Included in the totality of the circumstances are potential red flags which may make reliance unreasonable:

> Among other things, a court may consider whether there were any red flags that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* (cleaned up).

The totality of the circumstances in this case establishes actual and reasonable reliance. The bank reviewed the borrowing base certificates and Red Willow's financial statements regularly. When it had questions, which at times it did, the bank followed up with Red Willow and the debtor. The bank's loan committee reviewed the loan periodically along with Red Willow's financial documents. The loan itself was never in default until Red Willow filed bankruptcy. The debtor argues he could not detect the inaccuracies in the certificates and reports – it is difficult to see how the bank, with less information, did not reasonably rely.

The debtor did not identify a red flag and the concentration of accrued rebates and inventory in transit did not constitute a red flag for the bank. There is no evidence the concentration deviated from prudent lending practice or industry norms. The debtor was himself a former loan officer with full access to Red Willow's books. He did not detect the inaccuracy until he ran a detailed inventory report and examined the underlying AgVance journal entries. Even then he could not determine the reason reports were not accurate. If the falsity was not apparent to the debtor running the business, an investigation by the bank would not have revealed it.

The final element is intent to deceive. Intent to deceive does not require a "malignant heart." *NAFCO Fed. Credit Union v. Lawson (In re Lawson)*, 308 B.R. 417, 423 (Bankr. D. Neb. 2004); *Housing Auth. of St. Louis Cnty. v. White (In re White)*, 472 B.R. 883, 887 (Bankr. E.D. Mo. 2011). An intent to deceive can be established by proving the debtor acted with "reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement." *Lawson*, 308 B.R. at 423. "Factors to consider include the debtor's intelligence and experience in financial matters and whether there was a clear pattern of purposeful conduct." *Southeast Neb. Coop. Corp. v. Schnuelle (In re Schnuelle)*, 441 B.R. 616, 624 (B.A.P. 8th Cir. 2011) (citations omitted).

Evidence of the debtor's intent regarding line of credit advances is best divided into two periods because of the "to the extent obtained by" phrase in § 523(a)(2). On October 29, 2024, the debtor discovered facts establishing the

borrowing base certificates were false.[2] Advances fall into two categories – those made before October 29, 2024, and those made after.[3] The debtor's intent during both periods must be determined independently. Only fraudulently obtained advances are excepted from discharge. It is not "equitable for a bankrupt to be deprived of discharge on all his indebtedness to a particular creditor simply because a small portion of it was procured dishonestly." *Jennen v. Hunter (In re Hunter)*, 771 F.2d 1126, 1130 (8th Cir. 1985). The Eighth Circuit in *Hunter* cited the Second Circuit case *Household Fin. Corp. v. Danns (In re Danns)*, 558 F.2d 114, 116 (2d Cir. 1977). In *Danns*, the Second Circuit construed the predecessor section to 523(a)(2). It held:

> The language of s 17a(2) bars discharge only of "liabilities for obtaining" extensions of renewals of credit "in reliance upon a materially false statement"; this strongly implies that the creditor should be entitled to bar discharge *only of that portion of his loan as was obtained fraudulently*…. Accordingly, since exceptions to discharge are to be narrowly construed, we read s 17 a(2) as barring discharge only to the extent that the creditor could actually have relied upon the debtor's misrepresentation.

*Danns*, 558 F.2d at 116. *Danns* itself is part of the legislative history of § 523(a)(2). *See F & M Marquette Nat'l Bank v. Richards (In re Richards)*, 81 B.R. 527, 530 n.3 (Bankr. D. Minn. 1987) (reciting legislative history).

---

[2] The debtor and the broker disagreed on the timeline. The debtor testified he dug into Red Willow's financial reports in October because a buyer had questions. But the broker testified the listing terminated in September. The listing agreement is not in evidence. The inconsistency is a month or less and is not material to this case. The other buyer was only a catalyst. There is no evidence the other buyer identified errors in Red Willow's financial statements.

[3] Technically, the bank did not establish when $7,148,629.73 of the line of credit was advanced. The loan originated on August 31, 2022. But the bank offered only a loan history report beginning January 2, 2024. It appears likely a large advance was made when the bank originated the loan. Red Willow's October 31, 2022, balance sheet reports a current liability titled "NLB ROLC" in the amount of $7,485,629.73. This is roughly the balance of the loan in January 2024.

The bank also did not offer sufficient evidence the $7,148,629.73 was advanced based on borrowing base certificates or financial statements. The parties only stipulated borrowing base certificates and financial statements were submitted "*from time to time*" and "*between*" August 31, 2022, and the Red Willow bankruptcy. "Between," not "on and after."

These technicalities are of no real consequence because of the intent findings.

Some factual circumstances apply to both time periods. The debtor is an intelligent business operator. He was a bank loan officer for four years. As a loan officer, he managed Red Willow's loan. He pursued and took classes toward a fraud examiner certification. He was COO of Red Willow for over one year before he purchased it. During this one-year period he helped oversee Red Willow's finances and employees. The magnitude of the falsity of the statements is significant and extends over two years.

On the other hand, the falsity was not apparent to either the bank, which performed spot inspections, or the debtor, who the court finds generally credible on this issue. The debtor relied on Red Willow employees to track inventory and rebates and to enter accounting transactions into the bookkeeping software. The debtor verified the information on the borrowing base certificates by comparing it to the company's actual financial reports. He provided the same reports to the bank, which also detected no problems with the reports or during its inspections. The actual falsity of the financial statements was only discovered after the debtor performed a meticulous review of detailed accounting journal entries. In addition, between October 28, 2024, and the filing of Red Willow's bankruptcy, Red Willow paid down the line of credit by approximately $1 million.

For the pre-October 29, 2024, period, the bank offered no evidence to distinguish whether the debtor's failure to discover the problem rose beyond simple negligence to the level of recklessness required under § 523(a)(2). The bank also did not establish it would have demanded and collected the full balance but for the debtor's concealment of his October 29, 2024, discovery. As a result, all pre-October 29, 2024, advances are discharged.

After October 29, 2024, the totality of the circumstances changed. The debtor signed and submitted materially false borrowing base certificates and financial statements. When he signed them, he had serious questions about their accuracy. The potential issues were "devastating". But he did not inform the bank or stop the automatic borrowings. He signed the certificates, which allowed Red Willow to borrow additional funds after October 29. The loan was payable on demand, and the bank retained discretion to freeze advances. Given the dramatic nature of the errors, the bank would not have continued to lend to the debtor. Therefore, all borrowings after October 29, 2024, are excepted from discharge. The borrowings total $191,000. The bank is also entitled to interest from and after the date of each advance at the contract rate.

The payments the debtor made after October 29 should not reduce the amount excepted from discharge. Under Nebraska law, unless otherwise agreed, principal payments credit the oldest advances first.

> It is a familiar rule that, when a debtor makes payments on a running account, where neither he nor his creditor makes a particular application of the payments, the law will apply them to the first items in the debt.

*State ex rel. Spillman v. Sec. State Bank of Eddyville*, 218 N.W. 407, 408 (Neb. 1928); *see also Diesel Serv., Inc. v. Accessory Sales, Inc.*, 288 N.W.2d 258, 262 (Neb. 1980) ("[P]ayments ought to be applied to extinguish the debts according to the priority of time; so that the credits are to be deemed payments pro tanto of the debts antecedently due."); *Matter of Wiegert*, 145 B.R. 621, 623 (Bankr. D. Neb. 1991). This allocation is known as FIFO, First In, First Out. "The FIFO method allocates payments first to the unpaid amount of the oldest purchase and then sequentially to the remaining debts in the order in which they were incurred[.]" *In re McAllister*, 267 B.R. 614, 624 (Bankr. N.D. Iowa 2001).

One Eighth Circuit case applied proration on the unique facts of the case. *See In re Hunter*, 771 F.2d 1126, 1130 (8th Cir. 1985). But proration is not appropriate in this case for various reasons. Nebraska law applies the FIFO method. The debt is a single revolving line of credit and the debtor's loan documents are consistent with the FIFO method. And proration applies most of the payments to the discharged portion of the loan, depriving the bank of any meaningful remedy, given the significant increase in the bank's exposure in October and November.

### Conclusion

$191,000 of the debt owed by the debtor and defendant Cleo G. Spencer to the plaintiff NebraskaLand Bank is excepted from discharge under 11 U.S.C. § 523(a)(2)(B). Interest on the debt from and after the date of the borrowings, in accordance with the contract documents, is also excepted from discharge. The real estate loan is discharged. A separate judgment will be entered.

Dated: June 11, 2026

BY THE COURT

/s/ Brian S. Kruse
Brian S. Kruse
Chief Bankruptcy Judge